Say PATRICK, Plaintiff,

v.

Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant.

No. 2035.

United States District Court,
E. D. Kentucky,
Lexington Division.

April 15, 1970.

Hollon & Hollon, Hazard, Ky., for plaintiff.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., for defendant.

## MEMORANDUM

SWINFORD, District Judge.

The plaintiff, Say Patrick, brings this action under the provisions of 42 U.S.C. § 405(g). The decision of the hearing examiner, dated December 5, 1968, became the final decision of the Secretary on January 8, 1969, when the Appeals Council held that the decision of the hearing examiner was correct. This action was timely filed on March 3, 1969.

The record is before the court on the motions for summary judgment filed by the defendant and plaintiff on July 22, 1969, and October 7, 1969, respectively. The motions have been briefed and the answer of the defendant includes a certified transcript of the entire record of proceedings relating to the plaintiff's claim for disability benefits.

Mr. Patrick's first claim was filed on August 19, 1960. It alleged that he became unable to work on the last day of 1957. The impairments were listed as "Leg and hip hurt in jeep wreck while in service. Fainting spells." This claim was denied on July 21, 1961, and no further steps for a review of the decision were taken by the plaintiff.

The next application for benefits, which is the subject of this action, was filed on February 17, 1967. It alleged his disability as being "nervous condition, blackout spells, leg and hip". This application was initially denied on July 17, 1967, and again on October 10, 1967, after the plaintiff had requested a reconsideration of his claim. A hearing was then held, at the request of the plaintiff. At the hearing on October 16, 1968, the plaintiff appeared with his attorney and testified at length. He also offered a witness who testified as to the work the plaintiff had done for him. Subsequently the hearing examiner rendered his decision in which he held that the claimant was not entitled to a period of disabiliity or to disability benefits under the provisions of 42 U.S.C. §§ 416 (i) and 423, respectively. His findings of fact and conclusions of law are as follows:

"FINDINGS OF FACT

"1. That the claimant filed an initial application on August 19, 1960, alleging disability the last part of the year of 1957; that the same was considered and denied under date of July 21, 1961; that the claimant filed another application on February 17, 1967, and alleged disability as of December 10, 1966; that it was upon this application that the present hearing was conducted.

"2. That the claimant holds insured status for disability purposes through June 30, 1961; that after claimant last met the earnings requirements he was able to work the last three quarters of 1963, the first three-quarters of 1964, and the last three quarters in 1965; and the first two quarters in 1966; that the nearest medical report to his alleged date of disability was November 2, 1966.

"3. The claimant was born on November 8, 1921. He has a third grade education. He is unable to read or write except to sign his name; that he spent one year in the CCC camp learning to cook; that he was in the army 11½ months; that he has had no other special training.

"4. That the claimant's alleged impairments were not borne out to showing him to have a physical or mental impairment which resulted from anatomical psychological or physiological abnormalities which were substantiated by medical reports based upon medically acceptable clinical and laboratory diagnostic techniques on or before June 30, 1961, when the earnings requirements were last met.

"5. The claimant was not disabled on December 10, 1966, the alleged date of onset nor at any time prior to that date back to June 30, 1961, when the claimant last met the special earnings requirements nor by reason of any medically determinable physical or mental impairment or combination thereof which could be expected to result in death or which had lasted or could be expected to last for a continuous period of at least 12 months.

"CONCLUSIONS OF LAW

"1. The claimant is not entitled to a period of disability under Section 216 (i) of the Social Security Act, as amended.

"2. The claimant is not entitled to disability insurance benefits under Section 223 of the Social Security Act, as amended." (Tr–14–15)

The record discloses that the plaintiff, who is now 48 years of age, is an uneducated laborer. He lives with his wife and six children at Furnace, Kentucky. He said he "went and went to school" but "couldn't learn nothing". (Tr–37) After leaving school (in the third grade) at about the age of fifteen, he served two

years in the CCC camp. There he learned to cook, which he stated if he were able to work would be his occupation. He was in the army in 1943 and was honorably discharged because of "inaptness". It was while he was in the army that he was thrown from a jeep and injured his hip. He spent considerable time in the hospital before his discharge. However, he stated he was not put in a cast, but that he was given electrical shock treatments for his "head". (Tr–41)

After his discharge from the army he worked in Dayton, Ohio as a laborer, digging ditches and cleaning tile. He also worked on the railroad in West Virginia. This was laboring work—track nailing, putting in ties, flagging, pick and shovel, etc. Exhibit 1, Tr–88, Disability Questionnaire, lists Brown & Williamson Tobacco Co., Lexington, Kentucky, as his employer from June or July, 1959, to December, 1959. However, in a Report of Contact, Exhibit 16 (Tr–118) this was given as one month only.

The plaintiff stated at the hearing that he had not worked for two years. His last job was at a stave mill where he caught the small strips of wood as they came from the saw. (Tr–83)

His chief complaints are the pain in his leg and hip joint, and "nervous spells". He just "lay(s) around the house" all day, sleeping and watching television. He does no work around the house, but is able to take care of all his personal needs.

The medical evidence from the Veterans Administration Hospital, Lexington, Kentucky shows that he was admitted there on May 17, 1960, as a voluntary patient "presenting: 'fainting spells', sudden loss of strength in the leg, frontal headache, soreness in the chest, nervous tension, inability to endure being in a 'stuffy place', intense aggravation over being nagged by his wife, an impulse to kill his wife and threatening to kill his wife on his return home." (Exhibit 20, Tr–140)

The physical examination revealed "an appendectomy scar in the right lower quadrant. The patient complains of pain in the left hip joint on standing and walking and especially on climbing stairs. The feet are flat. There is some tenderness on pressure over the head of the left femur. The rest of the physical examination is within normal limits." (Tr–140) The neurological examination was negative. The mental examination is as follows:

"The patient is cooperative but is neither friendly nor hostile. He is interested in the interview and reveals moderate tension. He expresses intense aggravation over the behavior of his wife. There is slight to moderate psychomotor retardation. The mood appears to be mildly depressed but the patient denies thoughts of suicide. He says that he wants to kill his wife. Thought associations are loose. The content shows preoccupation with the wife's alleged aggravating treatment of the patient. There are no delusions or unusual perceptions. The patient is oriented properly but is slow in his responses. His retention shows some impairment. He remembers three and red but not the word broadway. He knows the names of the last three presidents. Intelligence is dull. Thinking is concretistic. Calculation is done slowly and poorly. Judgment is poor. There is minimal insight." (Tr–140–141)

The plaintiff was transferred to the disturbed section of the Continued Treatment Service because of his homicidal thoughts towards his wife. He was given medication and assigned activity in the gymnasium and swimming pool. Later he was assigned to the Manual Arts Therapy Shop but "eloped" one week later on June 16, 1960. This Supplemental Report, dated July 11, 1960, and signed by Dr. P. G. Smith lists "Impairment: Severe. (It should be noted that the patient was assigned for diagnostic conference on July 19, 1960, but eloped before this conference could

be carried out.) The patient is considered to be INCOMPETENT." (Tr–141)

The Discharge Summary dated August 16, 1960, signed by Dr. Berta M. Orth lists the impairment as "Moderate" and adds "Outcome: Treated, improved slightly.". (Tr–139)

The reports also show that "on 6–26–60 a letter was received from the patient's wife stating that he had come home and was 'doing fine'." (Tr–138)

The plaintiff was again admitted to the Veterans Hospital on July 12, 1962 complaining of severe facial pain. He was examined, treated for sinusitis and two premolar teeth were extracted. He was discharged on July 23 and told to return for reevaluation in one month. (Tr–151)

Apparently, from a letter of August 23, 1962, to Dr. Paul Maddox of Campton, Kentucky, the plaintiff returned to the Veterans Hospital as directed. Dr. C. I. Schwartz's letter is as follows:

"Mr. Say Patrick, who has had recurrent episodes of pain over the distribution of the left facial nerve, was discharged today from the Veterans Hospital.

"During his second stay here, we have reevaluated the condition of his teeth and the dentist feels no further treatment is needed at this time. In addition to this, our E.E.N.T. consultant has evaluated his sinuses and feels this is not a focus of infection.

"Because of the persistence of a small lymph node in the left preauricular area, this was biopsied one week ago. The final pathological report has not yet been obtained, but the node grossly appeared to be inflammatory in nature.

"Because of the bizarre nature of his complaints and other statements he had made, particularly regarding blackout spells, our medical consultant evaluated him also. He feels that Mr. Patrick's problem is primarily psychotic in nature, indeed that the man represents a case of true paranoia.

"We are indeed unable to explain the bizarre nature of the complaints of pain and are beginning to revise our initial opinion that these episodes represented facial neuralgia secondary to surrounding inflammatory disease. Particularly in view of the opinion of our medical consultant, we feel that this complaint regarding his health might be a part of his entire mentally disturbed picture.

"We wish that we could have been able to find an organic cause for his lesion, but since Mr. Patrick declined psychiatric therapy, we feel there is little more we have to offer him. When the final pathologic report is received at this hospital, we shall forward it on to you.

"Thank you very much for referring Mr. Patrick to this hospital. Should you feel we can be of further assistance, please do not hesitate to return him to our care." (Tr–154)

Dr. Giles Stephens, Consultant in Surgery, Veterans Regional Office, Louisville, Kentucky, examined Mr. Patrick on November 2, 1966. Exhibit 26 gives his rather comprehensive examination and the diagnosis is: "(1) Bilateral Pes Planus" (flat feet) and "(2) Osteoarthritis Lumbar Spine at both hip joints".

The exhibit also includes a neurological examination by Dr. R. E. Bingham. His diagnosis was: "Mental deficiency, mild with inadequate personality. COMPETENT." (Tr–161)

Mr. Patrick has also been examined by Dr. Carl Wiesel, a full time specialist in psychiatry, of Lexington, Kentucky. This psychiatric evaluation was on April 26, 1961. His report, Exhibit 21 (Tr–143–144) contains this statement. "Psychiatric status revealed him to be in good contact and without psychosis. He is illiterate and probably functions on a mental defective level. Sensorium is clear. No delusions or hallucinations are elicit-

ed. He does not appear unduly depressed nor tense." The diagnosis was: "Mental Deficiency Without Psychosis."

A psychological examination by Dr. Hans Hahn, Head of the Department of Psychology at Transylvania College, Lexington, Kentucky, on June 9, 1961, (Wechsler-Bellevue Scale, form I) showed a full scale intelligence quotient of 74. He said there was no emotional instability; and that he was "completely able" to carry simple tasks to completion, follow directions under supervision and cooperate with others in work situations. Dr. Hahn's final comment was "(h)is nervousness and lack of education probably produced a lower I.Q. score than he has in actuality, and his difficulty seems to be physical and not mental." (Tr-147)

Dr. Paul Maddox, a general practitioner of Campton, Kentucky, saw the plaintiff three times from July 12, 1962, until February 18, 1967. On the last examination he said, "I am rather inclined to feel that a lot of this mans difficulty is psychiatric rather than real. He certainly does not have findings compatible with the herniated disc syndrome from an objected standpoint." (Tr-149)

On October 13, 1967, Dr. Maddox wrote the following letter to Mr. John Cox, an attorney of Stanton, Kentucky:

"Dear Sir:

"The above named patient (Say Patrick) was seen and evaluated by me and requested that I send you a statement concerning his present condition. He seems to be having a great deal of difficulty with his left hip and walks with a slight stoop and favors his left leg. I did not X-ray him at this time since he has been extensively studied by the Veterans Administration and the University Hospital.

"It is my feeling that this man has a mild degree of arthritis involving his low back and left hip and if he has herniated disc syndroms I am unable to definitely localize same at this time. He also has a very severe psychiatric overlay which further complicates his organic disease. In his present condition he would not appear to be capable of doing a great deal of work and due to his psychiatric condition, he will be difficult to rehabilitate.

Yours very sincerely,

Paul F. Maddox, M.D.

Campton, Kentucky

(Tr-173)

Dr. Charles Terry, a general practitioner of Irvine, Kentucky, examined the plaintiff on February 20, 1967. His only diagnois was "psychosomatic disorder". (Tr-163)

On August 14, 1967, Dr. Terry made a second report in which he stated that he had seen the plaintiff "weekly" since the February 20 examination. His complete report is as follows:

"Mr. Say Patrick has severe psychosomatic disorder and multiple complaints. Mr. Patrick seems to have psychotic tendencies and should if possible be evaluated at VA hospital." (Tr-168)

Dr. John Franklin Knox, a general practitioner of Stanton, Kentucky examined the plaintiff on February 17, 1967. His diagnosis was "low blood pressure". (Tr-166)

The Act plainly directs that "the findings of the Secretary as to any fact, if supported by substantial evidence shall be conclusive, * * *." 42 U.S.C. § 405(g); Davis v. Gardner, 6 Cir., 395 F.2d 681; Rose v. Cohen, 6 Cir., 406 F. 2d 753.

■ The court must conclude from the evidence that the findings of the Secretary are supported by substantial evidence and are binding upon this court.

The description of the plaintiff, given by Dr. Bingham, in his examination of November 2, 1966, is as follows:

"He is a 43 year old male. He is tall, undernourished, stooped with poor posture. He is poorly dressed, in old weather-beaten clothes. He has a haggard careworn facial expression, deep set eyes. Hair is disheveled. Teeth

dirty, carious. (He says he doesn't have the money to have them fixed). He has had no schooling and many previous examiners including the Army, considered him mental defective and to have an inadequate personality. He does have many inadequacies and as he says, in these modern times, with prices going up every day, it is hard for a man with his inadequacies to earn a living for his wife and children. He doesn't know what he is going to do. He has some emotional instability. He gets mad quickly as shown by his reaction to the Welfare worker in Powell County who told him he was a veteran and he should get his help from the Army and not from the Welfare. There is something in his medical records sometime about his getting so mad, he threatened to kill a wife. That is a flareup of anger. He shows no signs of psychosis. He is not exactly a neurotic either. He is below average intelligence. He has many inadequacies in his personality makeup. And, this was recognized in the Army where they gave him a diagnosis of Mental Deficiency and Inadequate Personality. With these inadequacies, he has been able to make it fairly well up until the past five years when he has gotten down in his back and his left hip, can't do heavy work, the only type of work he knows. He will say 'between you and me, its almost starvation. They tell me I'm not going to get any better. I may get worse as I get older. I don't know what I'm going to do.' His blackouts come on when he is hot with exertion." (Tr–160)

With variations, this description, unfortunately, would fit many welfare applicants in Eastern Kentucky. It arouses the sympathy of the court and as said by the court in King v. Gardner, 6 Cir., 370 F.2d 652 (1967), "we regret that we cannot provide Mr. King with a remedy that might in some degree make up to him the burden of his affliction. The law, however, has not given us the means to do so."

■■ The plaintiff here has failed to prove that he met the requirements of the statute on June 30, 1961, when the earnings requirements were last met. The award of benefits cannot rest upon imagination, speculation, conjecture or sympathy—only credible proof in some form will suffice. Certain standards and tests for the administration of this Act are required to be established to differentiate it from a form of direct relief. It thus becomes the clear duty of those charged with administering the program to adhere to these standards and apply them fearlessly lest the program become the subject of abuse and ridicule. Bailey v. Gardner, D.C., 269 F.Supp. 100.

In reconsidering and denying the claim filed on February 17, 1967, Mr. John E. Bluett, Director, Division of Reconsideration, Bureau of Disability Insurance, Social Security Administration, quite cogently stated the basic facts:

"You stated that you became unable to work in December 1966, at age 45, because of blackouts, arthritis in your hips and legs as well as a nervous condition. The medical evidence in your case includes reports from your personal physicians and Veterans Administration hospital records. The medical information submitted with your prior claim was also considered. This evidence reveals that you have been examined for blackouts. It also shows however, that this condition did not result in any serious complications which would have prevented you from engaging in your usual activities at any time the earnings requirement was last met. Although you do have an arthritic condition there is no indication that this condition would have significantly restricted your ability to stand, walk and bend at that time. The medical reports show that you are somewhat nervous, but clinical psychiatric findings fail to establish the existence of an emotional disorder which would severely interfere with

your ability to think, remember or understand." (Tr–109)

Whether the plaintiff is or is not now capable of substantial gainful activity is not the question. Proof of a current disability will not entitle a claimant to benefits. Henry v. Gardner, 6 Cir., 381 F.2d 191 (1967), cert. denied 389 U.S. 993, 88 S.Ct. 492, 19 L.Ed.2d 487, rehearing denied 389 U.S. 1060, 88 S.Ct. 797, 19 L.Ed.2d 864. The fact that he has been granted total disability by the Veterans Administration may be considered by the court but it is not controlling. Hunley v. Cohen, D.C., 288 F. Supp. 537.

The motion of the defendant for summary judgment should be sustained and an order to that effect is this day entered.