**CARGILL, INC., d/b/a Nutrena Feeds,**
**Appellant (Plaintiff Below),**

v.

**BUNKER HILL ELEVATOR CO., INC.,**
**First Farmers National Bank, and Garry S. Worl, Appellees (Defendants Below).**

No. 34A04–8605–CV–157.

Court of Appeals of Indiana,
Fourth District.

March 18, 1987.

Jeffrey G. Price, Peru, for appellant.

James T. Beaman, Beaman, Kauffman & Scheer, Marion, for appellees.

YOUNG, Judge.

This is an appeal from a judgment in favor of First Farmers National Bank in a suit for damages brought by Cargill, Inc. We affirm.

On June 25, 1981, Bunker Hill Elevator signed a security agreement with First Farmers National Bank. The agreement provided that Bunker Hill was giving Farmers a security interest in "all inventory of grain, feed, fert [sic], chemicals, hardware, lumber, and other inventory for sale." The agreement also gave Farmers a security interest in all equipment which was subsequently acquired by Bunker Hill and all of Bunker Hill's personal property, accounts receivable and contract rights.

Between July 5, 1982 and January 3, 1983, Bunker Hill executed four notes in favor of Farmers. The first of these notes stated that it was secured by a security agreement dated June 26, 1981 [1] and that it covered inventory and accounts receivable. The second note was executed for the purpose of assigning a mortgage from another lender and did not purport to give any security interest. The third note stated that it was secured by an agreement dated June 26, 1981 and that Bunker Hill was "giving a security interest in Mortgage, Inventory Accounts Receivable & Equipment." The fourth note stated that it was secured by an agreement dated June 26, 1981 and that Bunker Hill was "giving a security interest in Mortgage, Inventory Accounts Receivable & Equipment." The fourth note stated that it was secured by an agreement dated June 26, 1981 and that Bunker Hill was giving a security interest in "Mortgage, Inventory, Accounts Receivable & Equipment." Additionally, the fourth note stated that Bunker Hill was giving a security interest in "collateral securing other loans...."

On Friday, May 6, 1983, Farmers received a check drawn on Bunker Hill's account at Farmers. The check was made payable to one of Bunker Hill's suppliers, Nutrena Feeds, a Division of Cargill, Inc. Farmers dishonored the check and marked it "hold on account." Farmers returned the check to Cargill on May 6, 1983. Farmers also set-off part of what it was owed by Bunker Hill against Bunker Hill's account. Farmers posted a zero balance in Bunker Hill's account on Monday, May 9, 1983.

On May 20, 1983, Bunker Hill transferred, by written agreement,[2] its assets to Farmers. Included in the assets transferred were three trucks, elevator mixing and loading equipment, Cargill's feed and seed, and tax refunds due Bunker Hill. Subsequently, Farmers, without notifying Car-

---

**1.** The inconsistency between the actual date the security agreement was signed and the reference dates to it in the notes was not addressed by the parties.

**2.** Attachments to this agreement included a Corporate Warranty Deed transferring all of Bunk-

er Hill's realty to Farmers, a Peaceful Possession Agreement transferring all of Bunker Hill's tangible personal property to Farmers, an Assignment of Accounts Receivable and a General Assignment of all cash, bank accounts, tax refunds and other tangibles.

gill, sold a number of items it had received from Bunker Hill at an auction which had been advertised in a newspaper.[3]

Cargill brought suit against Farmers. After a bench trial, the court entered judgment in favor of Farmers upon the following pertinent findings of fact and conclusions of law:

2. That at all times herein, Defendant, FIRST FARMERS NATIONAL BANK, was a secured creditor of BUNDER [sic] HILL ELEVATOR.

3. That as a security for its debt, ELEVATOR, gave BANK, for valuable consideration, a security interest through various documents, and at various times, in all of the real estate of BANK, all inventory of grain, seed, feed, fertilizer, chemicals, hardware, lumber and other inventory for sale, all accounts receivable, as well as inventory, and equipment.

4. That bank seized Elevator's checking account on May 6, 1983, and effectively set off the account on that date.

5. That Check No. 3139 of Elevator was presented to bank by Nutrena Feeds on May 6, 1983.

6. That said check was dishonored by Bank on May 6, 1983 and returned to Plaintiff.

\*   \*   \*   \*   \*   \*

8. That the debt owed by Elevator and secured by security agreement dated June 25, 1981 continued to grow from 1981 to 1983 when Elevator went out of business.

\*   \*   \*   \*   \*   \*

12. That on May 20, 1983, Bank and Elevator entered into an agreement wherein Elevator delivered title and possession for all of its assets to the Bank in satisfaction of its debt to the Bank.

13. That the agreement conveyed all equipment, furniture and fixtures of Elevator to the Bank, as well as all tax refunds, choses in action, cash, and all other assets, tangible or intangible, including books and records of Elevator.

14. All of the security agreements between Bank and Elevator refer to the original security agreement of June 25, 1981 and to the two mortgages held by Bank upon Elevator's real estate.

15. That after all set-offs, refunds, accounts receivable, and the sale of assets, there was still a delinquency in Elevator's debt to Bank.

\*   \*   \*   \*   \*   \*

17. That Plaintiff did not have a written security agreement between itself and Elevator regarding the sale of goods. On May 23, 1983, when Bank received from Elevator all of its assets, Supplier was a general unsecured creditor of Elevator.

## CONCLUSIONS OF LAW

1. That pursuant to I.C. 26–1–6–201 et seq. the bulk sales law does not apply to the transfer of assets by Bank to Elevator in this case.

2. That without any security agreement the FIRST FARMERS NATIONAL BANK stood as a general unsecured creditor of Elevator.

3. That FIRST FARMERS NATIONAL BANK, had a valid security interest in a major part of the materials, supplies, merchandise, and other inventory and equipment and was therefore not subject to the bulk transfer law.

4. That Indiana law permits a preference among creditors provided that the debtor acts in good faith and the transaction is not tainted with fraud, even though the debtor is in failing circumstances or insolvent.

5. That the Bank and Elevator acted in good faith.

6. That Bank had no relationship, contractual or otherwise, with Plaintiff and owed no legal duty to Plaintiff in that Plaintiff was a general unsecured creditor of Elevator, held no security interest in any property belonging to Elevator that was transferred to Bank.

---

**3.** According to Farmers, several public and private sales were held to dispose of Bunker Hill's assets. Cargill, however, only argues that one of them was in violation of the Bulk Transfer Act.

7. That the dishonor of Elevator's check to Bank on May 6, 1983, was not wrongful.

8. Plaintiff has failed to show sufficient evidence that Bank had a specific duty to Plaintiff or that Bank violated any specific duty to Plaintiff.

(R. 244–46)

Cargill acknowledges that when a trial judge makes written findings of fact and conclusions of law pursuant to Ind.Rules of Procedure, Trial Rule 52, an appellate court will not set them or the judgment aside unless they are clearly erroneous. *First Fed. Sav. & Loan Assoc. of Gary v. Stone* (1984), Ind.App., 467 N.E.2d 1226. Cargill reminds us, however, that an appellate court may only affirm the trial court based upon its specific findings and not upon any grounds supported by the evidence. *Shrum v. Dalton* (1982), Ind.App., 442 N.E.2d 366, 372.

Cargill contends that the trial court committed clear error in concluding that Farmers' dishonor of Bunker Hill's check was not wrongful. As best as we can discern, Cargill bases its argument on the following propositions:

1) Farmers' set-off did not occur until May 9, 1983;

2) Farmers had no valid reason for dishonoring the check until May 9, 1983.

3) Farmers was obligated under IND. CODE 26–1–4–301(1)(a) to act upon the check prior to May 9, 1983 because that date was beyond Farmers' midnight deadline;

4) Because Farmers did not have a valid reason to dishonor the check until May 9, 1983 and because that date was beyond Farmers' midnight deadline, the check should be regarded as finally paid and Farmers held accountable for the amount of the check under IND.CODE 26–1–4–213(1).

▮ Under Cargill's theory, the key issue is whether Farmers set-off against Bunker Hill's account occurred on May 6, or May 9, 1983. Cargill argues that the court's finding that the set-off effectively occurred on May 6, 1983 is clearly erroneous. Cargill bases this argument on the

fact that two debits were posted by Farmers after May 6, 1983 and the fact that a zero balance was not posted on Bunker Hill's account until May 9, 1983.

One of the checks which was paid out on May 9, 1983 was a check made out to Bunker Hill's bookkeeper for payroll. The bookkeeper would endorse the check and take the cash to Bunker Hill. Bunker Hill employees would cash their paychecks at Bunker Hill and their paychecks would then be deposited into Bunker Hill's account. The payroll checks had been cashed from the fund kept at Bunker Hill prior to May 9, 1983. The other debit was for the set-off. We find the argument regarding the two debits unpersuasive. It is unclear from the record on what date the payroll check was cashed. It could have been presented for payment on May 6, 1983 prior to Farmers' receipt of the check written to Cargill but not posted against Bunker Hill's account until May 9, 1983. The other debit was Farmers' set-off.

Farmers' branch manager testified that he believed the set-off occurred on May 6, 1983 even though it was not posted until May 9, 1983. Cargill fails to cite authority for the proposition that a set-off becomes effective only upon being posted. Cargill therefore has failed to demonstrate that the trial court committed clear error in finding that the set-off effectively occurred on May 6, 1983. It follows that Cargill's theory fails to demonstrate that the trial court committed clear error in concluding that Farmers' dishonor of the check was not wrongful.

We note that Cargill's theory would fail even had the set-off not occurred until May 9, 1983. Cargill supports its theory with additional propositions which are factually and legally inaccurate.

Cargill first proposes that Farmers was obligated to act on the check under IC 26–1–4–301(1)(a) prior to May 9, 1983 because that date was beyond the midnight deadline. IC 26–1–4–301(1)(a) provides:

Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank other-

wise for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (IC 26–1–4–213(1)) and before its midnight deadline it returns the item.

In the present case, Farmers returned the item on May 6, 1983, the same day it received it.

■ Even had the item not been returned prior to May 9, 1983, Farmers would have still been able to return the item on May 9, 1983 because that date was Farmers' midnight deadline. " 'Midnight deadline' with respect to a bank is midnight on its next banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." IND. CODE 26–1–4–104(h). Because May 6, 1983, the date which Farmers received the check was on a Friday, Farmers' midnight deadline would have been Monday, May 9, 1983 unless Saturday was considered a banking day for Farmers. Cargill does not allege in its brief that Farmers was "open to public for carrying on substantially all of its banking functions," IND.CODE 26–1–4–104(c), on Saturday May 7, 1983. Farmers, in its brief, however, does assert that Monday, May 9, 1983, was "the next business day". Further, testimony at trial indicates that Farmers was not open on Saturday.

■ Cargill's proposition that Farmers is accountable for the amount of the check under IC 26–1–4–213(1) is also incorrect even assuming that Cargill's first three propositions are correct. IC 26–1–4–213(1) provides:

An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such a right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner prescribed by statute.

Upon final payment under subdivision (b), (c), or (d), the payor bank shall be accountable for the amount of the item.

The evidence does not support a finding that Farmers made final payment under subdivision (b), (c), or (d) of IC 26–1–4–213(1). The statute is therefore inapplicable.[4]

■ While Cargill therefore could not recover under its theory even had the set-off been found to have occurred on May 9, 1983, Cargill failed to demonstrate that the trial court clearly erred in finding the set-off occurred on May 6, 1983.[5] It is upon

---

4. A more applicable statute to Cargill's theory is IND.CODE 26–1–4–302(a) which provides:

In the absence of a valid defense such as breach of presentment warranty (IC 26–1–4–207(1)), settlement effected or the like, if an item is presented on and received by a payor bank, the bank is accountable for the amount of a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depository bank, retains the item beyond midnight of the banking day of receipt without settling for it or regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.

Even under this statute, however, Cargill would not be able to recover from Farmers because Farmers returned the item on May 6, 1983

which, even under Cargill's theory, was prior to Farmers' midnight deadline.

5. In its reply brief, Cargill argues that Farmers improperly refused payment of the check under IND.CODE 26–1–4–303. This argument is waived, however, because Cargill failed to raise it in his original brief. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7); *Lambert v. Yellowbird, Inc.* (1986), Ind.App., 496 N.E.2d 406, reh. denied 498 N.E.2d 80, *citing Indiana Dept. of Mental Health v. State on Relation of Southlake Center for Mental Health* (1984), Ind.App., 467 N.E.2d 1256, 1265. Even had this argument not been waived, however, we would find it unpersuasive. IC 26–1–4–303(1) in pertinent part provides:

Any ... set off exercised by a payor bank, whether or not effective under other rules of

this failure that we therefore affirm the trial court's conclusion that the check was not wrongfully dishonored.

Cargill next contends that the trial judge committed clear error in concluding that the Bulk Transfers Act (IND.CODE 26–1–6) did not apply to the May 20, 1983 transfer of assets between Bunker Hill and Farmers. In particular, Cargill argues that Farmers was obligated to notify it under IC 26–1–6–105[6] because the transfer included tax refunds due Bunker Hill and three trucks.

■ Although Cargill admits that the tax refunds due Bunker Hill were general intangibles, it implies that Farmers was required to have a security interest in them for the Bulk Transfers Act to be inapplicable. We disagree. "A 'bulk transfer' is any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise, or other inventory...." IND. CODE 26–1–6–102(1). A transfer of equip-ment may constitute a bulk transfer if a substantial part of the transfer of equipment is made in connection with a bulk transfer of inventory. IND.CODE 26–1–6–102(2). Bulk transfers of goods may be subject to the Bulk Transfer Act. IND. CODE 26–1–6–102(3). Given that transfers of general intangibles are not within the definition of a bulk transfer, the Act is not applicable to the transfer of the tax refunds due Bunker Hill.

■ Cargill asserts that the trucks are equipment[7] and therefore are subject to the Bulk Transfers Act. While acknowledging that a transfer "in settlement of a lien or other security interest" is excepted from the Act under IND.CODE 26–1–6–103(3), Cargill argues that "equipment" does not "reasonably describe"[8] the trucks and therefore Farmers did not hold an enforceable security interest in the trucks.[9] We disagree. While the issue is one of first impression in Indiana, the majority of jurisdictions which have considered it have

law to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if ... the set off is exercised after the bank has done one of the following:

(a) accepted or certified the item;

(b) paid the item in cash;

(c) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule, or agreement;

(d) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item; or

(e) become accountable for the item under IC 26–1–4–213(1)(d) and IC 26–1–4–302 dealing with payor bank's responsibility for late return of items.

Cargill has failed to allege and we can find no evidence that Farmers did any of the acts envisioned in subdivisions (a)–(e) prior to the time it set off against Bunker Hill's account. Farmers' set-off therefore did not come too late.

6. IND.CODE 26–1–6–105 provides:

In addition to the requirements of IC 26–1–6–104, any bulk transfer subject to IC 26–1–6, except one made by aution sale (IC 26–1–6–107), is ineffective against any creditor of the transferor unless at least ten (10) days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons provided in IC 26–1–6–106.

7. In its brief, Cargill contends that the trucks were either business personal property or equipment. The Uniform Commercial Code, however, does not characterize property as "business personal property." Rather, personal property is characterized as either accounts, contract rights, general intangibles, or goods. Goods are further characterized as consumer goods, farm products, inventory or equipment. Hence, while the trucks were certainly personal property, they were, for U.C.C. purposes, further characterized as equipment. In its reply brief, Cargill states that trucks are not equipment and cites *In re Laminated Vaneers* (1973), 2nd Cir., 471 F.2d 1124, for that proposition. The case, however, does not stand for the proposition that trucks are not equipment but that two trucks were not covered under a security agreement which gave the creditor a secured interest in the debtor's "equipment" where the security agreement specifically mentioned a third vehicle. We have therefore discussed this issue on the basis that the trucks are equipment as they were used primarily in Bunker Hill's business and were not inventory, farm products or consumer goods. See IND.CODE 26–1–9–109.

8. IND.CODE 26–1–9–110.

9. IND.CODE 26–1–9–203.

held that "equipment" describes the collateral sufficiently to create or perfect a secured interest. *Re Sarex Corp.* (1975), 2nd Cir., 509 F.2d 689 (applying New Jersey law); *United States v. First Nat. Bank* (1973), 8th Cir., 470 F.2d 944 (applying Nebraska law); *American Plating & Mfg. v. Liberty Nat. Bank & Trust Co.* (1979), D.C.Ky., 468 F.Supp. 103 (applying Kentucky law); *In re Dobbins* (1973), D.C. Kan., 371 F.Supp. 141 (applying Kansas law); *Cheek v. Caine & Werner Co.* (1971), C.D.Cal., 335 F.Supp. 1319 (applying California law); *In re Bloomingdale Milling Co., Inc.* (1966), W.D.Mich., 4 U.C.C.Rptr. 256 (applying Michigan law); *United States v. Antenna Systems, Ind.* (1966), D.C.N.H., 251 F.Supp. 1013 (applying New Hampshire law); *In re Tenpenny* (1986), E.D.Tenn., 64 B.R. 217 (applying Tennessee law); *In re Tebbs Const. Co., Inc.* (1984), E.D.W.Va., 39 B.R. 742 (applying West Virginia law); *Matter of Wiskur* (1983), W.D. Mo., 31 B.R. 39 (applying Missouri law); *In re Burnett* (1982), D.N.M., 21 B.R. 752 (applying New Mexico law); *Re Whitacre* (1976), Farmers., 21 U.C.C.R.S. 1169 (applying Ohio law); *Re Page* (1974), Farmers., 16 U.C.C.R.S. 501 (applying Florida law); *Re Newkirk Mining Co.* (1962), Farmers., 54 Berk. Co. L.J. 179, 1 U.C.C.R.S. 468 (applying Pennsylvania law); *Galleon Industries, Inc. v. Lewyn Mach. Co.* (1973), 50 Ala.App. 334, 279 So.2d 137, cert. denied 291 Ala. 779, 279 So.2d 142; *Maryland Nat. Bank v. Porter Way Harvester Mfg. Co.* (1972), Del.Supr., 300 A.2d 8; *First Nat. Bank & Trust Co. v. Olivetti Corp. of America* (1974), 130 Ga.App. 896, 204 S.E.2d 781; *Nat. Cash Register Co. v. Firestone & Co.* (1963), 346 Mass. 255, 191 N.E.2d 471; *Bankers Trust Co. of Western New York v. Zecher*, 426 N.Y.S.2d 960, 103 Misc.2d 777; *American Nat. Bank & Trust Co. v. Nat. Cash Register Co.* (1970), Okla., 473 P.2d 234; *Milwaukee Mack Sales, Inc. v. First Nat. Bank* (1980), 93 Wisc.2d 589, 287 N.W.2d 708; *Security*

*Bank & Trust Co. v. Blaze Oil Co.* (1970), Wyo., 463 P.2d 495. We therefore hold that the term "equipment" was a sufficient description of the trucks to grant Farmers a security interest in them.[10] It follows that their transfer to Farmers was excepted from the Bulk Transfers Act under IC 26–1–6–103(3).

Cargill has failed to demonstrate that the trial court committed clear error in concluding that Farmers did not wrongfully dishonor Bunker Hill's check and in concluding that the Bulk Transfers Act is inapplicable to the transfer between Bunker Hill and Farmers. We therefore affirm.

Affirmed.

CONOVER, P.J., and NEAL, J., concur.

---

**10.** Cargill supports its contention that Farmers did not hold a security interest in the trucks with the fact that the financing statements Farmers filed did not cover equipment. This fact, however, is irrelevant. While Farmers did not have a perfected security interest in the trucks because it failed to include equipment in its financing statements, its security agreement gave it a security interest. For a transfer to be excepted from the Bulk Transfers Act, the creditor must hold only a security interest, not a perfected security interest. IC 26–1–6–103(3).